## ATTERBURY v. HORTON & HORTON.
### (No. 7387.)

(Court of Civil Appeals of Texas. Galveston. May 11, 1917. Rehearing Denied June 21, 1917.)

1. MASTER AND SERVANT ☞201(4)—UNSAFE CONDITION OF PLACE OF WORK—VICE PRINCIPAL.

If, through a fellow servant's negligence, bricks were piled around the edge of a manhole in which a bricklayer was working, creating danger of his being injured by falling brick, the employers would be liable if such dangerous condition of the premises was discovered by their foreman, who was their vice principal, in time to have it remedied by the use of ordinary care before the bricklayer was injured as a result thereof, and the foreman failed so to do.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 524.]

2. MASTER AND SERVANT ☞286(27) — INJURIES—QUESTIONS FOR JURY.

Where a bricklayer working in a manhole was struck by falling brick claimed to have fallen from brick negligently allowed to be piled too near the edge of the manhole, evidence *held* to make the master's negligence a question for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1082.]

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Action by A. T. Atterbury against Horton & Horton. From judgment for defendants, plaintiff appeals. Reversed and remanded.

Woods, King & John, of Houston, for appellant. Andrews, Streetman, Burns & Logue, of Houston, for appellees.

PLEASANTS, C. J. This suit was brought by appellant against appellees to recover damages for personal injuries which plaintiff alleges were caused by the negligence of the defendants. The petition alleges, and the evidence shows, that, while in the employment of defendants in the capacity of a bricklayer and engaged in laying brick in an excavation in a street of the city of Houston along which defendants were constructing a sewer for said city, plaintiff was injured by a brick which fell into the excavation and struck him.

The following are the grounds of negligence alleged in the petition:

"(a) In failing and refusing to furnish plaintiff with a reasonably safe place to work and perform his duties.

"(b) In failing and refusing to place a proper guard around said hole to prevent brick or other substances from slipping, rolling, or falling in and injuring plaintiff.

"(c) In permitting and placing, or causing to be placed, large quantities and numbers of brick on the planks over one side of said hole, and in close and dangerous proximity to the edge of said plank over said hole, and in permitting and placing, or causing to be placed, large quantities of brick around the edge of said hole in close and dangerous proximity thereto, from which said plank or from the edge of said hole one of the said brick either fell, slipped, or rolled into said hole and struck plaintiff and injured him, as above alleged.

"(d) In placing, and causing or permitting to be placed, brick one upon the other around said hole and on said planks, so high until one of them fell, slipped, or rolled off and injured plaintiff as aforesaid.

"(e) In failing and refusing to provide a safe means of lowering the brick, which plaintiff was required to lay and place, from the surface to the bottom of said hole."

The defendants answered by general demurrer, special exceptions, and general denial, and further specially pleaded that plaintiff's injury was the result of an unavoidable accident, that plaintiff assumed the risk of such injury, and, if the injury was due to the negligence of any one, it was the negligence of a fellow servant of plaintiff.

After hearing the evidence, the trial court instructed the jury to find a verdict for the defendants, and, upon the return of such verdict, judgment was rendered in accordance therewith.

Under an appropriate assignment of error, the appellant complains of the charge instructing the jury to return a verdict for the defendants. The first proposition submitted under the assignment is as follows:

"The evidence being sufficient to justify the jury in finding that defendants' vice principal knew that bricks were piled in close proximity to the edge of the platform under which plaintiff, a servant of defendant, was at work, and that danger existed of one or more such bricks being jarred or knocked off of such platform and falling on plaintiff and injuring him, in time to have either warned the plaintiff or to have had such danger remedied before any such bricks should fall off, or be jarred or knocked off of such platform, at the risk of injury to plaintiff, and plaintiff having actually suffered injury as a result of a brick falling from the said platform, and no affirmative defense being established by undisputed evidence, it was error for the trial court to instruct the jury peremptorily to find in favor of defendants."

The excavation in which plaintiff was working was 30 or 35 feet deep and 20 feet in diameter. At the time of his injury, he was 8 or 10 feet from the bottom of the excavation engaged in the work of walling it up with brick. The brick used in the work was passed to him by a fellow servant, who lowered them in a bucket attached to a rope. The man who lowered the brick stood on a platform made of several large pieces of lumber laid across the top of the hole. This platform extended from the center of the hole to within a short distance of the edge of one side of the hole. The brick were lowered from the side of the platform over the center of the hole. At the time plaintiff was struck, he was working on the side of the hole near which the platform before mentioned was laid, and was seven feet or more from the center of the hole where brick were being lowered as before stated. There was a pile of several thousand brick about 25 feet from the edge of the hole. By the method in which the work was usually carried on, one or more of defendant's employés would take brick in a wheelbarrow

from the pile before mentioned to within a few feet of the hole, and from these brick would fill the bucket used by the man who lowered the brick in the hole and pass it to him. All of the employés engaged in this work were instructed not to pile brick on the platform or nearer than 5 or 6 feet from the edge of the hole.

Plaintiff testified:

"At the time I was struck, I guess I was standing about two feet or two feet six inches from the side of the hole, to the best of my recollection. That would throw me then about seven feet six inches, or something like that, from the center of the hole. I had just asked the time at 20 minutes past 4 on a Saturday time, and no sooner asked the time than I was knocked down; that was in the afternoon, on Saturday. The brick I was laying down there would be passed down. There would be a negro on top. That negro would stand right dead in the center of the hole. It is the hole around here (indicating), and he would stand right in the center here; he was letting the brick down in a bucket. He stood right in the center. He would get in the center of the hole. There was a few planks laid across one side of it, and he stood in the center of the hole and let the brick down in a bucket. He got the brick by the negroes on the top bringing them to him. They got the brick about 25 or 35 feet away from the hole. There were no bricks piled close to that hole or on those planks when I went down there at 1 o'clock. When I went down there at 1 o'clock, they were 25 or 30 feet away from it. I did not get out of the hole from 1 o'clock until the time the brick fell on me, when I was injured. A man by the name of Mr. Farrell (Fahr) customarily stayed up on top of the surface around that hole and directed the placing of the brick. He was the foreman. * * * It was his business to discharge and employ the men on top of the ground. I say when I went down there at 1 o'clock there wasn't any brick nearer than 25 or 30 feet to the edge of the hole, at two or three minutes to 1 there wasn't. Mr. Farrell was there when I went down. I spoke to him several times during the afternoon. To the best of my recollection, it was a little after 4 o'clock, a quarter past 4, or something like that, I spoke to Mr. Farrell (Fahr) before this accident. I would say it was 5 or 10 minutes before the accident occurred. I hear Mr. Farrell (Fahr) talking on top of the ground. * * * A bricklayer by the name of Etie was down there with me. That brick struck me right on the left side just about above my hip, almost to the center of my back. It knocked me out. That is all I remember of it right then until I came to, above the hole. I was carried out of the hole by Farrell and Mr. Etie, the brick mason. Those two men carried me out of it. I was unconscious and didn't know anything until I got up. They told me afterwards who carried me out. All I can remember doing after the brick struck me was rolling on the planks I was working on. When I came to, regained consciousness, the first thing I remember I was in the little tent on the right of the hole, right against that negro church there, and he turned to me and said, 'Just wait a minute, Atterbury, and we will send for a hack for you,' and as I came out of the tent—they pulled the clothes on me the best they could and carried me around past the hole—the brick was scattered all around on top of the hole. There was brick on top of the plank where the negro was passing the brick down. I cannot estimate what number of bricks were on the planks. I should say roughly between 400 or 500 bricks scattered around there. Those brick were right to the last plank that was over the hole. They were one on top of the other, just piled up there. They looked to me as if they were dumped there. They weren't stacked. I guess those brick were piled up about 18 inches or 2 feet on the plank on top of the hole. I would say the brick were piled about 6 or 8 inches from the edge of that hole, some maybe nearer than that. There was brick scattered all around that hole. They were dumped. Those brick were on the same side of the hole that I was in when I was struck; they were piled up above my head. If a brick had fallen from the bucket that was being let down by the negro in the center of the hole, it would have been impossible for it to have hit me. It would have missed me about 7 feet or 7 feet 6 inches."

Mr. Fahr, defendant's foreman, who is called Mr. Farrell by plaintiff, testified:

"Of course, every four or five minutes I would be around there to see if everything was going right."

And further on cross-examination:

"I had been there just a little while before. I never was any farther away than 15 or 20 feet, approximately 20 feet away from there where we were moving an engine out. I was right where I could see. Of course, I might have been right behind the engine. Of course, if I was behind the engine I couldn't see. I didn't go behind the engine and stand there. My position was where I could see all around the works there."

The witness Claud Tibbs testified:

"My name is Claud Tibbs. I am working for Horton & Horton. I have been working for them about four years. On the 31st of May, 1913, I was working for Horton & Horton. I know Mr. A. T. Atterbury, the gentleman there. I was on the job when a brick struck him out there in the manhole. I don't know whether there was any one standing immediately above the brick, where it fell from. I didn't see anybody; I didn't see anybody then standing there where the brick fell, not that I noticed. I don't know how came that brick to fall. There was no wheelbarrow there at the time; there was none there that I know of. I told you to-day at noon that a wheelbarrow might have dumped it there. That is the way that brick might have gotten in there; I told you that. I didn't see anybody with a wheelbarrow just above the place where the brick fell from."

[1] While this testimony is meager and unsatisfactory upon the question of where the brick which struck plaintiff came from and how it was precipitated into the hole, we think it sufficient to authorize a finding that it came from the pile of brick which plaintiff testified he saw piled around the edge of the hole and on the platform after he was taken from the hole and regained consciousness, and either because of the manner in which they were piled, or by a jar caused by those working around the brick, one of them fell into the hole and struck plaintiff. That the presence of these brick as described by plaintiff, under the existing conditions, rendered his place of work unsafe, cannot be questioned. Conceding that this unsafe condition of the place was caused by the negligence of a fellow servant, if such condition was discovered by defendants' foreman, who was their vice principal, in time to have remedied it by the use of ordinary care before plaintiff was injured as a result thereof and he failed so to do, the defendants would be liable for injury to plaintiff so caused.

If there were piles of brick around the hole and on the platform shortly after plaintiff's injury, as testified by him, an inference stronger than a mere surmise or suspicion might be drawn that this condition existed for some length of time before the accident in which plaintiff was injured. The evidence negatives the idea that these brick were put there after the accident, and also tends to 'show that they were not dumped or piled there immediately preceding the accident. From the quantity of them, it would have taken some time for one man to have placed them there from the larger pile 25 feet away.

[2] Fahr testified that he "was around there every four or five minutes to see if everything was going right." The jury might have found from this testimony that he did see the dangerous conditions surrounding the hole in time to have remedied them and negligently failed to use proper care to protect plaintiff, notwithstanding his statement that the last time he looked at the platform he did not see a brick on it. The dangerous condition of the premises, if it existed as testified to by the plaintiff, could have been remedied immediately and easily. It is clear that, if Fahr knew of this condition and failed to use proper care to protect plaintiff from injury thereby, defendants would be liable for such injury. Railway Co. v. Sasse, 22 S. W. 187; Railway Co. v. Hohn, 1 Tex. Civ. App. 36, 21 S. W. 942; Paul Stone Co. v. Saucedo, 171 S. W. 1038.

We think the trial court erred in taking the case from the jury. It follows that the judgment should be reversed, and the cause remanded, and it has been so ordered.

Reversed and remanded.